Submitted March 22, reversed July 11, 2012

Sylvia Marvel HANNEMANN,
*Petitioner-Respondent,*

*v.*

Gerald Wayne ANDERSON,
*Respondent-Appellant.*

Deschutes County Circuit Court
09AB0515AB; A147165

283 P3d 386

Alta Jean Brady, Judge.

Alexander Spalding filed the briefs for appellant.

Andrea Malone and Legal Aid Services of Oregon filed the brief for respondent.

Before Ortega, Presiding Judge, and Sercombe, Judge, and Hadlock, Judge.

HADLOCK, J.

**HADLOCK, J.**

Respondent appeals the trial court's continuation of a restraining order that petitioner obtained against him under the Family Abuse Prevention Act (FAPA), ORS 107.700 to 107.735. Respondent asserts that petitioner failed to present sufficient evidence to support continuation of the order. For the reasons set out below, we reverse.

Although we have discretion to review this case *de novo*, ORS 19.415(3)(b), we decline to do so, as we do not view this as an exceptional case. *See* ORAP 5.40(8)(c) ("The Court of Appeals will exercise its discretion to try the cause anew on the record or to make one or more factual findings anew on the record only in exceptional cases."). Accordingly, we presume that the trial court found facts consistent with its judgment in petitioner's favor (the court made no express findings), *see Lefebvre v. Lefebvre*, 165 Or App 297, 302 n 2, 996 P2d 518 (2000), and we are bound by those implicit factual findings if any evidence in the record supports them. *Maffey v. Muchka*, 244 Or App 308, 313, 261 P3d 26 (2011). We review the trial court's legal conclusions for errors of law. *Id.*

Viewed consistently with that standard of review, the record discloses the following: The parties met in the early 1990s, when petitioner began working for respondent in Bend. In 1995, petitioner and her two children moved to a home that respondent owned in Arizona, which petitioner planned to renovate in exchange for receiving some of the proceeds from an intended sale of the house. Respondent moved into the Arizona home with petitioner and her children a few months later.[1]

Shortly after arriving in Arizona, respondent began behaving in a "very possessive, obsessive, angry" manner toward petitioner. Petitioner's daughter testified that, although the children never directly witnessed any violence, they "heard arguments all the time, yelling, screaming,

---

[1] Petitioner specifically testified that she and respondent "cohabited" in the Arizona house. *See* ORS 107.705(1), (3) (defining the term "abuse" for purposes of the FAPA to be abuse of "family or household members," including "[p]ersons who are cohabiting or who have cohabited with each other").

things being thrown, bruises all over [their] mother." Petitioner recounted one particularly violent incident that occurred at some point between 1996 and 1998:

> "[H]e began to tell me how worthless my children were and I said—I retaliated is what I did.
>
> "And he walked out the door and he came back in and instantly he was strangling me and I my head was—I was standing in the kitchen, I'd been drying the dishes and my head was up underneath the cupboards * * * [a]nd he was strangling me until I was blacking out and I couldn't remember anything. And in just a few minutes he let go of me and—and somehow or another I had had a plate in my hand that I'd been drying or something and I—and I hit him in the head and it cut him and he let go of me * * * [a]nd for days afterward the roof of my mouth, my tongue were really black."

Less than two weeks after that incident, respondent was arrested on unassociated charges and incarcerated in Utah. During the little over two years that respondent was in prison, petitioner continued to live in the Arizona home and stayed in contact with respondent. Respondent often wrote petitioner about his wish to continue their relationship, and he twice sent petitioner letters purporting to grant her power of attorney so that she could "sell his things [and do] anything that [she] needed to get his business affairs, his finances in order."

In October or November of either 1999 or 2000, "very close to the time for [respondent] to get out of prison," petitioner moved back to Oregon, where she has remained. Petitioner brought many of respondent's possessions to Oregon with her, including many family heirlooms and collectables, two vehicles, and other household items—presumably to sell some items and to store others in accordance with respondent's wishes. By August of 2001, at the latest, petitioner had "ended any contact" with respondent. Respondent, for his part, has lived in Arizona since his release from prison.

Petitioner and respondent had no further contact until 2005, when respondent wrote petitioner a letter. In that letter, respondent inquired about petitioner's parents' health, and stated that he could finally afford to come to

Oregon to get the possessions that petitioner had been "keeping safe" for him. He also wrote, "I may need your assistance with the theft, that we had while in Utah. I have an attorney. Please provide me with a phone number and address for you." Petitioner responded by informing respondent in writing that she saw his letter as a threat, given his awareness that she had sold all of his belongings to pay his bills. Petitioner also wrote:

> "Don't call me. [Don't] write me. Don't try to contact me in any manner. * * * I want nothing to do with the false insurance claim that you filed on the house * * * [d]o not threaten me with your lawyer as we all know that you claim at all times to have a lawyer on retainer and you never do. * * * Do not show up at my home or any of my families homes. You will be arrested on site for trespassing."

Respondent has not contacted petitioner since the exchange of those letters. However, in September 2009, approximately a week before petitioner filed the FAPA petition, respondent called petitioner's elderly friend, Doreen Gahimer, who had become acquainted with respondent through petitioner long ago. Over the years, Gahimer sometimes sent respondent "encouraging letters" when she heard that he "got in trouble again." Gahimer sent respondent one such letter on August 31, 2009, encouraging him to stay "spiritually active" and stating, "I think of you often, I'd like to hear from you." Respondent called Gahimer soon after that letter was sent. Gahimer did not find respondent's phone call "threatening," but she was surprised to receive the call and found it "rather odd" and "a little unusual" that, for the majority of the conversation, respondent asked "a lot of questions about [petitioner] and her circumstances what—what she was doing and about the property she lived on and if her parents had died and so on." Gahimer answered most of respondent's questions except those "pertaining to finances, money," and told petitioner about the phone call immediately afterward.

Petitioner filed for and obtained an *ex parte* FAPA restraining order against respondent in September 2009, promptly after she learned of respondent's call to Gahimer. Respondent requested a hearing, which was held in October

2010.[2] At the hearing, petitioner testified that she was frightened by respondent's phone call to Gahimer "because it sounds—sounded to [her] like he intended to come here and take his things." Petitioner also testified that she was terrified that respondent would kill her if he did not "get his way." When asked what she believed would happen if respondent came to Oregon, petitioner stated:

> "[O]n numerous occasions [respondent] told me what he would do to anyone who didn't do what he wanted. Like he would tell me that one of his ex-wives that he would—he intended to find her one day and cut the tendons in her hands and in her face so that she couldn't use her hands at all, that she couldn't open her eyes. He even said she was very [vain] about her hair and so he would scalp her.

> "And then he—he let us know, me and my children, that he knew how to dispose of a body in just a few days by putting them in acids. And he knew what [to] use and within a few days no one would even be able to know that there was ever a human in that."

Petitioner also testified that, while they were living together, respondent told her at least once that he would kill her. In addition, petitioner said, respondent always carried a gun

---

[2] This case comes to us in an unusual procedural posture. The September 16, 2009, FAPA *restraining order was never served on respondent*, but respondent's attorney discovered it in January 2010, while he was researching an unrelated matter. Respondent immediately requested a hearing, and eventually waived any jurisdictional objections so the hearing could proceed on the merits of the order's issuance. *See* ORS 107.718(10)(a) (allowing for a respondent to request a hearing within 30 days after a restraining order has been served). That hearing, which was held on October 12, 2010, resulted in *continuance* of the original *ex parte* restraining order—essentially, the trial court refused to set aside the order pursuant to respondent's request. Roughly one month before that hearing, however, petitioner had obtained an order *renewing* the original order through September 2011. *See* ORS 107.725 (the court may renew an order entered under ORS 107.718 upon a finding that a "person in the petitioner's situation would reasonably fear further acts of abuse by the respondent if the order is not renewed"). The trial court stated at the October 2010 hearing that the court and parties would "be dealing with the original petitions," acknowledging the delay since the original *ex parte* order issued in 2009. Neither party suggested that the court also should consider the propriety of the September 2010 order renewing the original restraining order, and respondent has not appealed that renewal order. Thus, the only issue properly before us is respondent's challenge to the issuance of the original 2009 restraining order, as continued by the October 27, 2010, order from which respondent has appealed; we do not address the September 2010 renewal order.

and a baseball bat in his car. The trial court continued the FAPA restraining order, and this appeal by respondent followed.

Under ORS 107.718(1), a court may issue a FAPA restraining order on a showing that the petitioner

"[(1)] has been the victim of abuse committed by the respondent within 180 days preceding the filing of the petition, that [(2)] there is an imminent danger of further abuse to the petitioner and that [(3)] the respondent represents a credible threat to the physical safety of the petitioner or the petitioner's child[.]"

*Fielder v. Fielder*, 211 Or App 688, 693, 157 P3d 220 (2007) (quoting ORS 107.718(1); numbers bracketed in *Fielder*). "A petitioner must meet each of those requirements to obtain a FAPA restraining order." *Id.* "Abuse" is defined in ORS 107.705(1) as:

"(a)  Attempting to cause or intentionally, knowingly or recklessly causing bodily injury.

"(b)  Intentionally, knowingly or recklessly placing another in fear of imminent bodily injury.

"(c)  Causing another to engage in involuntary sexual relations by force or threat of force."

On appeal, the parties focus on two aspects of petitioner's request for a restraining order. First, the parties disagree about whether respondent's attempt to strangle petitioner in the late 1990s qualifies as an act of "abuse" within 180 days prior to the filing of the FAPA petition.[3] Petitioner argues that the tolling provision in ORS 107.710(6) applies here, extending the otherwise-applicable 180-day period, because petitioner was incarcerated only about two weeks after he physically abused petitioner, and respondent and petitioner lived more than 100 miles apart after he was released from prison.[4] Respondent disagrees.

---

[3] Petitioner does not contend that any of respondent's actions since then qualify as "abuse."

[4] ORS 107.710(6) provides:

"For purposes of computing the 180-day period in this section and ORS 107.718, any time during which the respondent is incarcerated or has a principal residence more than 100 miles from the principal residence of the petitioner shall not be counted as part of the 180-day period."

He argues that ORS 12.140—which provides that a civil action "for any cause not otherwise provided for shall be commenced within 10 years"—precludes petitioner from relying on the strangling incident as an act of "abuse" for purposes of the FAPA statutes. The parties' second point of disagreement relates to the legal sufficiency of the evidence that petitioner is in imminent danger of further abuse or that respondent presents a credible threat to her physical safety.

For purposes of this appeal, we need not decide whether petitioner was a victim of abuse "within 180 days preceding the filing of the petition" under ORS 107.718(1) and ORS 107.710(6)—and despite ORS 12.140—because we agree with respondent that the evidence is legally insufficient to fulfill the other requirements of ORS 107.718(1). Under that statute, a FAPA restraining order will be upheld only if the evidence established that "the alleged conduct create[d] an imminent danger of further abuse and a credible threat to the physical safety of the petitioner." *Hubbell v. Sanders*, 245 Or App 321, 326, 263 P3d 1096 (2011). The evidence in this case—even viewed in the light most favorable to petitioner, with all permissible inferences drawn in her favor—is not sufficient to establish those prerequisites for a FAPA restraining order.

This case is not like those in which we have determined that the evidence supports a trial court's determination that the respondent's conduct put the petitioner in imminent danger of further abuse and presented a credible threat to the petitioner's safety. In each of those cases, the respondent had communicated with, or otherwise contacted, the petitioner in ways that reasonably could be construed as threatening imminent harm. For example, in *Hubbell*, the respondent repeatedly had trespassed on the petitioner's property, had chased her in his car, had made veiled threats in voicemail and text messages to her, "likely had unscrewed a light bulb near her back door while lurking there," and possibly had vandalized her car. 245 Or App at 326-27. Those actions demonstrated "a dangerous obsession" with the petitioner that adequately supported determinations that the petitioner was in imminent danger of further abuse and that the respondent posed a credible

threat to her physical safety. *Id.* at 327. A respondent's obsession with the petitioner also was apparent in *Lefebvre*, where, soon before issuance of a FAPA restraining order, the respondent engaged in behavior that was

> "erratic, intrusive, volatile, and persistent. He screamed obscenities in petitioner's face, unrestrained by the presence of their child, made numerous hang-up phone calls, and rummaged through her possessions. Notably, respondent's late night call describing the sleeping clothes petitioner was wearing put her on notice that he was lurking about her house, watching her, and that she was vulnerable. Moreover, petitioner knew that respondent had previously been obsessed with the idea of killing another person."

165 Or App at 301-02.

By way of contrast, in *Roshto v. McVein*, 207 Or App 700, 705, 143 P3d 241 (2006), the respondent repeatedly had e-mailed his ex-girlfriend after their relationship ended, professing his continuing love. However, because the record included no evidence of past abuse and no evidence of any personal contact during last 180 days, we found that it did not establish an imminent danger of abuse or a credible threat to petitioner's physical safety. *Id.* The case differed from *Lefebvre*, we held, because the latter case involved "more heightened, persistent, and alarming circumstances." *Id.*

Although this is a close case, we consider the evidence legally insufficient to establish that respondent's conduct put petitioner at imminent risk of further abuse or credibly threatened her physical safety. In making that determination, we do not question the genuine fear that petitioner experienced when she learned that respondent had reestablished contact with Gahimer. And we acknowledge that situations exist in which evidence of long-past acts or threats of violence, combined with evidence of a respondent's *present* overtly or implicitly threatening behavior, may justify issuance of a restraining order. *See Lefebvre*, 165 Or App at 302 (relying, in part, on fact that the respondent "had previously been obsessed with the idea of killing another person" in upholding continuance of a FAPA order). We conclude, however, that this case does not

present one of those situations, because the record includes no evidence from which a factfinder reasonably could infer that petitioner is in *imminent* danger.

Here, the only evidence petitioner presented to support the existence of a current threat is that respondent called Gahimer in 2009 after having sent petitioner a letter four years earlier. Even considered in light of petitioner's compelling testimony about respondent's past physical and verbal brutality (which occurred more than a decade ago), the phone call and letter present no basis from which one reasonably could infer that respondent presented an imminent danger to petitioner at the time that the restraining order issued. Neither of those contacts overtly threatened petitioner. Nor could they reasonably be construed to implicitly convey any imminent threat that respondent even would travel to Oregon (after all, he did not come to Oregon after he suggested, in the 2005 letter, that he might do so), much less that he would inflict further abuse on petitioner.

We acknowledge that a fine line divides reasonable inferences and impermissible speculative leaps. *See State v. Macnab*, 222 Or App 332, 335, 194 P3d 164 (2008) ("The line between a reasonable inference and impermissible speculation is not always easy to describe with precision."). But an inference is reasonable only if it is based on "an experience of logical probability that an ultimate fact will follow a stated narrative or historical fact." *Id.* (quoting *State v. Bivins*, 191 Or App 460, 467, 83 P3d 379 (2004)). In this case, any determination that respondent poses an *imminent* threat to petitioner falls on the speculative side of the line, given the complete lack of evidence that he has made— or even attempted to make—any contact with petitioner in at least the past 10 years other than sending a single letter in 2005 and, more recently, having a conversation with a mutual acquaintance. Under those circumstances, one could not reasonably infer either that petitioner was in imminent danger of further abuse or that respondent presented a credible threat to her physical safety. In short, the evidence is legally insufficient to support the issuance of a restraining order under ORS 107.718(1). We therefore

reverse the restraining order as continued by the circuit-court order dated October 27, 2010.

Reversed.