HADLOCK, P. J.
*466 *381 Petitioner and respondent were married in 2014 and they have one young child, J. Petitioner separated from respondent in July 2017, and she and J moved in with petitioner's parents. In October of that year, petitioner sought and obtained a restraining order against respondent under the Family Abuse Prevention Act (FAPA), ORS 107.700 to 107.735. On respondent's appeal, we conclude that petitioner did not meet her burden of proving that she was in imminent danger of further abuse from respondent at the time of the FAPA hearing. Accordingly, we reverse.
We review the trial court's legal conclusions for legal error. Kargol v. Kargol , 295 Or. App. 529, 530, 435 P.3d 814 (2019). We are bound by the trial court's factual findings-both those that are explicit and those that are necessarily implied by its rulings-if any evidence in the record supports them. Hannemann v. Anderson , 251 Or. App. 207, 208, 283 P.3d 386 (2012). We therefore describe the facts in a manner that reflects the court's findings and its ultimate decision to grant the FAPA order.
Petitioner and respondent were married in 2014. During his marriage to petitioner, respondent took medications for depression; he sometimes also drank alcohol to excess, despite warnings to the contrary associated with his medications. J was just under two years old at the time of the FAPA hearing. Petitioner worked part time and was J's primary caregiver; respondent was employed full time.
The physical incidents of abuse described by petitioner relate to involuntary sex. See ORS 107.700(1)(c) (defining "abuse" to include "[c]ausing another to engage in involuntary sexual relations by force or threat of force"). Sometime before March 2017, respondent joined petitioner while she was taking a shower. She told him that she did not want to have sex, but he pushed her against the shower wall and had intercourse with her, despite her telling him to stop. In May 2017, respondent subjected petitioner to involuntary sex again while forcibly holding her down on a bed, after having dragged her away from J, who was breast feeding. Petitioner suffered bruising on her arms as a result.
*382 Petitioner testified at the FAPA hearing that it had taken her a while to realize that respondent's actions toward her were wrong because respondent "was often sexually aggressive even if it was consensual and so the lines were very blurred for [her]."
In June 2017, petitioner told respondent that she was very unhappy in their marriage. Respondent told petitioner that he would kill her and take J if she ever left or divorced him. Respondent seemed "very relaxed" and, had petitioner not looked at his face, she "would have thought maybe he was joking." However, after looking at respondent, petitioner "felt like he was completely serious."
The following month, petitioner and respondent were showering together with J, and respondent urinated on petitioner and laughed about it. After those events, petitioner and J began spending more nights at the home of petitioner's parents, which was located near her workplace. Petitioner and respondent went to a marriage counseling session, but respondent said that, if petitioner was unhappy, it was her problem and that she needed to work on it.
On July 23, 2017, petitioner took J and went to live with her parents. Soon thereafter, she filed for divorce. Except during a subsequent mediation session and meetings associated with transitioning J to respondent for his parenting time, petitioner and respondent have not come face-to-face since petitioner moved to her parents' home. Respondent did not seek out petitioner at her place of employment or her school. He did once knock on the door and window of petitioner's parent's home and he left a note when nobody answered. At the FAPA hearing, petitioner's father did not recall what the note had said, although he agreed it could have referenced diapers or other supplies. Respondent testified that the note he left asked *467 petitioner's family members to contact him if they needed "any money or anything" for support.
In August, petitioner told J's pediatrician about what had happened between her and respondent. Respondent subsequently went to the pediatrician's office several times without an appointment, seeking to discuss J's well-being.
*383 The pediatrician was concerned that respondent had gone to the office "several times in-person with demands," and she directed respondent by letter to reach the office by telephone in the future unless he came in with J because of an emergency. The pediatrician found respondent's behavior, which she described as "repeatedly asking for information from my staff and sitting in the waiting room" very unusual; she had not seen that in her practice. Twice when father visited, it was to obtain medical records to which he was entitled, although the office would have preferred that he request the records in advance, instead of coming in and asking for them to be gathered while he waited. Father also requested that a chart note mentioning allegations of marital rape be amended to say that the allegations "are no more than allegations," and the pediatrician informed father that she would append that statement to the chart note that he was concerned about.
In late August, petitioner and respondent reached a temporary agreement about parenting time. Under that agreement, respondent saw J twice weekly and there was no requirement that visits be supervised. At meetings when J was transitioned from one parent to the other, respondent "made it a habit to drive around the block" and find petitioner's car, driving slowly by with an "angry, rage-filled stare" at petitioner and whoever was with her. Respondent frequently called, emailed, and sent text messages to petitioner, some of which were admitted as exhibits at the FAPA hearing. Petitioner described respondent's messages as sometimes being "loving and asking [petitioner] to come home"; sometimes, however, "they were angry, demanding that [she] return home right away with [J]." Respondent also said untrue things about petitioner and her family, claiming that they were crazy. Those communications made petitioner feel "threatened, upset, scared, [and] frustrated" because she felt that the messages "exhibited some sort of instability in [respondent's] thought process."
Petitioner and respondent participated in a mediation session on October 5, 2017, about custody and parenting-time issues. Toward the beginning of the mediation, respondent glared intensely at petitioner for a long period, which *384 led petitioner to feel that respondent was very angry at her. The mediator, Carr, also felt that respondent's stare was "meant to communicate extreme anger and rage." Carr asked respondent to quit staring, and he did, apologizing to Carr. At one point during the mediation, petitioner began to talk about the possibility of respondent's parenting time being supervised, and respondent asked that such a requirement not be imposed. Later, respondent described how "his parenting time takes place at his parents' anyway." Petitioner said something like, "thank you for admitting supervision is necessary" or that she "thought it was really wonderful that he felt like supervision was necessary as well." At that point, respondent became "very upset and angry," and he said "Fuck you" three times consecutively while again staring intensely at petitioner. Respondent did not lunge toward petitioner or "come at" her as he made those statements, but he began to lean forward in his chair.
Carr told respondent to stop and asked petitioner to leave the room; she then talked with respondent about how upset he was and whether he would be able to calm down enough to continue the mediation. He said no, and indicated that he would like to leave. Carr characterized respondent as not being out of control, but "as being very upset and unable to participate in a problem-solving process." Respondent then left the building. Petitioner stayed behind and spoke with Carr, crying and shaking as she did so. Carr suggested that petitioner speak with somebody at a domestic violence resource center. When petitioner was ready to leave, Carr provided her with an escort, which is common in that kind of situation "so that * * * the parties are not having any * * * inadvertent or other contact in the parking lot."
*468 Petitioner filed a FAPA petition a few days after the unsuccessful mediation session. The court issued an ex parte FAPA restraining order the same day. Respondent requested a hearing to contest the restraining order, and one was held on October 20, 2017. At that hearing, petitioner described respondent's conduct toward her, as summarized above, and testified that she is afraid of him. She asked that the FAPA order stay in place for her safety and the safety of J.
*385 Following the hearing, the trial court entered an order continuing the FAPA restraining order. The court found that petitioner was credible regarding the allegations of "involuntary sexual relations," respondent's statement in mid-June threatening to kill her and take the child, and respondent's "subsequent incidents of intimidation by text [message and] at mediation." The court found respondent's denials of that conduct not to be credible. Respondent appeals.
Under FAPA, a petitioner seeking a restraining order has the burden of proving by a preponderance of the evidence that the respondent "(1) 'abused' petitioner in the 180 days preceding the filing of the petition, (2) presents an 'imminent danger of further abuse' to petitioner, and (3) 'represents a credible threat to the physical safety of the petitioner.' " Kargol , 295 Or. App. at 532, 435 P.3d 814 (quoting ORS 107.718(1) ). Here, respondent concedes that, given the trial court's findings about him having subjected petitioner to involuntary sex in May 2017, petitioner met her burden of proving that respondent abused her during the 180-day period before she filed the FAPA petition. Respondent contends, however, that petitioner did not prove either that he presented an imminent danger of further abuse to petitioner or that he represented a credible threat to her physical safety. Petitioner has not filed a brief on appeal.
We need not determine whether the record in this case could support a finding that respondent represented a credible threat to petitioner's safety. That is because, for the reasons set out below, we conclude that the evidence is legally insufficient to establish that respondent presents an imminent danger of further abuse to petitioner.
We have recently observed that it can be "significant," in the FAPA context, if the relationship between victim and abuser has "changed once they no longer live[ ] together." Kargol , 295 Or. App. at 533, 435 P.3d 814. In those circumstances, even when the relationship was abusive and volatile when the parties lived together, that past history may-at least in some circumstances-not be sufficient to demonstrate that the petitioner remains in imminent danger of being abused. Id .
*386 Our recent opinion in Kargol illustrates the point. In that case, the parties (a married couple with a young child) had a "volatile history" that included, two years before the FAPA petition was filed, the respondent having grabbed the petitioner aggressively during an argument. Id . at 531, 435 P.3d 814. More recently, a few months before the petitioner filed her FAPA petition, the respondent screamed at her during an argument, raised a fist at her, and pushed her with a sofa cushion. Id . at 530, 435 P.3d 814. The petitioner attempted to drive away from the house, but the respondent got into her car and took her cell phone. Id . He eventually got out of the car but, after the petitioner started driving away, he followed her in another vehicle and pulled alongside her in a way that led her to believe that he was trying to run her off the road, risking her life. Criminal charges were filed against the respondent as a result of that episode. Id . at 530-31, 435 P.3d 814.
The Kargol petitioner and respondent separated a few months later and the petitioner sought a FAPA restraining order based on her "fear of respondent's tendency to escalate arguments to 'frightening and unsafe levels.' " Id . at 531, 435 P.3d 814. She supported her petition with evidence of emails and text messages showing that the respondent "would repeatedly ignore her requests that he stop contacting her" until she was ready to talk about modifying a parenting plan that they had agreed to. The respondent also said during a phone conversation that he had not attempted to kill the petitioner during the driving incident, but "could have because [he] was out of control." The petitioner acknowledged that there had been no additional *469 violent incidents; however, she asserted that "the 'combination of that phone call and those text messages terrified her.' " Id .
The trial court granted the FAPA order, but we reversed. We first observed that the Kargol respondent conceded that the record supported a finding that he had abused the petitioner within the pertinent 180-day period. Id . at 532, 435 P.3d 814. But we agreed with the respondent that the record did not include evidence sufficient to demonstrate that he remained a credible threat to the petitioner or that she was in imminent danger of further abuse. Id . at 532-33, 435 P.3d 814. In so holding, we emphasized that, despite "the parties' volatile *387 history," the nature of their relationship changed "once they no longer lived together." Id . at 533, 435 P.3d 814. In particular, since the abuse that occurred within the statutory period, there had been "no physical or volatile interactions between the parties," who had very limited contact, which mainly centered around their parenting plan. We acknowledged that overt physical threats are not required to prove that a respondent poses a danger. However, given the nature of the previous abuse and the nature of the contact between the parties since they separated, we held that the record was insufficient to justify issuance of the FAPA order. Id .
Our opinion in Kargol relied on previous cases in which we similarly found significance in the parties' separation and the changed nature of their relationship since then. For example, in Valenti v. Ackley , 261 Or. App. 491, 495, 326 P.3d 604 (2014), we reversed a FAPA order despite the fact that, when the respondent and the petitioner had lived together, their relationship was volatile and sometimes involved physical violence. The petitioner and respondent worked together and had an intimate relationship for a few years. Id . at 492, 326 P.3d 604. During their cohabitation-and in the 180 days preceding the petitioner's filing of the FAPA petition-the petitioner had found it necessary to lock the respondent out of their home following an argument. Id. at 493, 326 P.3d 604. The respondent broke down the door, petrifying the petitioner, who called the police. Following another argument during that period, the petitioner armed herself with a knife because she feared the respondent would physically harm her. The petitioner later explained that she feared the respondent because they "had been 'engaged in a very vicious cycle' of her 'over dependence on him and his abusiveness on [her].' " That past behavior included an argument and physical struggle in which the petitioner sustained a bloody nose and black eye. Id .
The Valenti petitioner obtained an ex parte FAPA order the day after the respondent broke down the door to their residence. Id . at 494, 326 P.3d 604. The respondent then moved out of the home. Thereafter, the respondent informed the petitioner by email that he wished to end their relationship. Nonetheless, he once violated a safety plan that the parties'
*388 mutual employer had established, walking in an area of the office designated for petitioner, and he announced a plan to attend an event that he knew the petitioner was planning to attend, although he ultimately did not attend, after petitioner informed the venue of the FAPA order. Id . Notwithstanding those incidents, we reversed the FAPA order, explaining that "the volatility that characterized the parties' relationship ended once the parties ceased cohabiting." Id . at 495, 326 P.3d 604. Given that the petitioner and respondent "continued to work together, and have some common social circles, without incident," we held that there was "no evidence that respondent posed an imminent danger of further abuse to petitioner and represented a credible threat to her physical safety." Id .
In Valenti , we contrasted our holdings in cases like Hubbell v. Sanders , 245 Or. App. 321, 263 P.3d 1096 (2011), in which we upheld the issuance of a FAPA order. In Hubbell , the respondent's alarming behavior included "persistent trespasses" on the petitioner's property (which likely included removing a padlock from her gate and unscrewing a light bulb above her back door), a threat made even after the ex parte FAPA order was issued, and a "dangerous obsession" with the petitioner that established that the petitioner was in imminent danger of future abuse and that the respondent represented a credible threat to her safety.
*470 Id . at 327, 263 P.3d 1096. Hubbell differed from Valenti because, in the latter case, no evidence about the parties' post-separation interactions established that the respondent continued to pose a threat to the petitioner's safety. Valenti , 261 Or. App. at 495-96, 326 P.3d 604.
This case is more like Kargol and Valenti than it is like cases such as Hubbell . The question here is not whether respondent abused petitioner in the 180 days preceding the FAPA petition-he did. Rather, the question is whether the evidence of that abuse, considered together with the evidence of the parties' interactions leading up to and following their separation, is legally sufficient to establish that petitioner is in imminent danger of further abuse.
We conclude that the evidence in this case is not sufficient to support such a finding of imminent danger.
*389 Respondent twice subjected petitioner to involuntary sex during the course of their marriage, once during the 180-day FAPA period and once earlier than that. However, petitioner has not suggested that respondent has sought, threatened, or attempted to engage in sexual conduct with her since they separated. Moreover, the record does not include any evidence of other incidents of abuse. That is, there is no evidence that respondent ever has abused petitioner by causing or attempting to cause her bodily injury, or by putting her in fear that such injury is imminent.
Thus, this record does not establish a repetitive pattern of conduct that qualifies as abuse under FAPA that could support an inference that the abuse will occur again in the near future. And petitioner does not contend that her fear of respondent is based on that kind of pattern of abuse. Rather, petitioner's fear is based primarily on respondent's anger as it has manifested in the mediation session and following transitions of J to respondent during his parenting time, when respondent drives past petitioner and glares at her. It is understandable that petitioner and her family are distressed by respondent's persistently angry demeanor. But-in the absence of any evidence that respondent has caused or attempted to cause petitioner bodily injury, and in the absence of any evidence that respondent has sought out or pursued petitioner in any other contexts since they separated-respondent's conduct is insufficient to demonstrate that petitioner is in imminent danger of further abuse.
Nor does the evidence of respondent's verbal communications with petitioner establish that prerequisite for issuance of a FAPA order. The text messages and emails in evidence reflect respondent's emotional reaction to petitioner having left their marriage and his anger and frustration regarding restrictions on his time with J. However, those messages cannot reasonably be construed as threats of harm against either petitioner or J. See Vanik-Burns v. Burns , 284 Or. App. 366, 372, 392 P.3d 386 (2017) (reversing FAPA order; holding that, although the petitioner perceived text messages from the respondent as threats, "she provided no evidence demonstrating that those messages could be reasonably construed as threats of harm (instead *390 of, for example, attempts to harass or annoy)"). Much more serious than the text messages is respondent's June 2017 statement to petitioner that he would kill her if she ever left him. In other circumstances, threats like that might well help establish ongoing danger that would justify issuance of a FAPA order. Here, however, respondent made the threat only once and there is no evidence that he has repeated the threat or taken any steps to harm petitioner or compromise her safety. Given the totality of the circumstances, that single threat-considered together with all the evidence in the record viewed in the light most favoring petitioner-is insufficient to establish that "there is an imminent danger of further abuse to the petitioner." ORS 107.718(1). For that reason, the court erred in issuing the FAPA order.
Reversed.