NELSON, J.
**505 This is a child custody dispute arising out of father's motion to modify a custody determination made at the time of the dissolution of the parties' marriage, which awarded mother sole legal custody of child. At the conclusion of the modification proceeding, the trial court found that there had been a material change in circumstances concerning mother's ability to parent child and that a change of custody from mother to father was *1282 in child's best interest, and it awarded sole legal custody of child to father. On mother's appeal, the Court of Appeals reversed the judgment of the trial court on the ground that, as a matter of law, there was insufficient evidence in the record to support the court's finding of a change in circumstances and, thus, that custody modification was not warranted. Botofan-Miller and Miller , 288 Or. App. 674, 406 P.3d 175 (2017). For the reasons that follow, we hold that sufficient evidence in the record supported the trial court's ruling that father had proved a change of circumstances. We also address an issue that the Court of Appeals did not reach: whether the trial court erred in concluding that a change in custody was in child's best interest. We hold that the trial court did not err in so concluding. Therefore, we reverse the decision of the Court of Appeals.
STANDARD OF REVIEW
Historically, in an appeal from a suit in equity, as with the instant case, appellate review of a trial court's findings was de novo . However, in 2009, the legislature amended ORS 19.415(3) to provide that de novo review in cases like this one is discretionary. Or. Laws 2009, ch 231, § 2. The Court of Appeals in this case declined to exercise its discretion to review the case de novo . Botofan-Miller , 288 Or. App. at 675, 406 P.3d 175. We also decline to review the case de novo .
In keeping with that approach, we view the facts pertinent to review of the Court of Appeals' change-in-circumstances decision in the light most favorable to the trial court's disposition. That is, we will uphold the trial court's findings of facts if there is any evidence in the record to support them. Sea River Properties, LLC v. Parks , 355 Or. 831, 834, 333 P.3d 295 (2014). As part of that consideration, when we view the record, we accept reasonable inferences **506 and reasonable credibility choices that the trial court could have made. State v. Cunningham , 337 Or. 528, 539-40, 99 P.3d 271 (2004). Moreover, if the trial court failed to articulate its factual findings on a particular issue, we assume that the trial court decided the facts in a manner consistent with its ultimate conclusions, as long as there is evidence in the record, and inferences that reasonably may be drawn from that evidence, that would support its conclusion. State v. Serrano , 346 Or. 311, 326, 210 P.3d 892 (2009).
The Court of Appeals concluded that the trial court erred in finding a change in circumstances and, for that reason, it did not reach the question whether the trial court erred in ruling that custody modification was in child's best interest. Appellate courts review the trial court's best interest determination for abuse of discretion. Epler and Epler , 356 Or. 624, 636, 341 P.3d 742 (2014) (so holding). That is, the court will uphold the trial court's best interest determination unless that court exercised its discretion in a manner that is "clearly against all reason and evidence." Espinoza v. Evergreen Helicopters, Inc. , 359 Or. 63, 117, 376 P.3d 960 (2016).
We state the following facts with those standards of review in mind.
UNDERLYING FACTS
The parties were married in April 2009, and child was born in June 2009. The parties separated in October 2010, when child was about 17 months old. Immediately after the separation, child spent most of her time with mother. Beginning in February 2011, child spent about a third of her time with father.
During the dissolution proceedings, there were some signs that mother was experiencing mental health issues. In 2010, mother twice reported to police that father was physically abusive toward her, but the trial court in the original dissolution proceeding concluded that her allegations were unfounded.[1] And, in February 2011, mother took child to a **507 hospital emergency room and reported that father had been poisoning her and child. According to a DHS report, mother appeared delusional, and there was no evidence of poisoning. *1283 Mother was hospitalized and given antipsychotic medications. Mother attributed the psychotic episode to sleep deprivation and her anxiety about father's extended parenting time. Mother's medical providers concluded that mother did not have a psychotic illness and that she was not at risk for recurring psychotic episodes.
Notwithstanding those incidents, at the time of the dissolution proceedings, father believed that mother and child had a healthy relationship and that child was flourishing. Father did not question mother's ability to parent child, and he did not object to mother's request for legal custody of child. For that reason, the trial court did not order a custody evaluation or make any findings about custody in its judgment of dissolution. The court awarded mother sole legal custody of child, awarded parenting time to father (including regular overnight stays), and, for reasons we will next discuss, ordered that child be immunized on a schedule set by an agreed-upon pediatrician. The parties' marriage was dissolved in July 2011, when child was about two years old.
During the dissolution proceeding, father learned that mother had not had child immunized according to the vaccination schedule set by child's pediatrician, Harper, and mother disclosed her general resistance to vaccinations to the trial court during a February 2011 hearing on certain temporary matters. At the conclusion of that hearing, the court ordered mother and father to follow Harper's recommendations for vaccinating child. In April 2011, the trial court entered a limited judgment in which it found that "[t]here has been a significant gap in the health care of the minor child" and ordered the parties to follow the pediatrician's directions "as to all health care issues, including vaccinations." About two weeks after that limited judgment was entered, father remained concerned that mother was interfering with the directions of the pediatrician. In an affidavit attached to a motion seeking certain medical records, father stated that he did not believe that child had received her scheduled vaccinations and booster vaccinations.
**508 In a court filing, mother responded that father had "exaggerated the gap in [child's] medical care." Mother explained that she had had financial problems obtaining and maintaining insurance coverage but had tried to keep child current with her vaccinations. She stated that, as had been required, she had taken child to Harper, who had recommended a course of vaccinations. Mother further explained that, thereafter, she became uncomfortable with Harper, because Harper had remarked on mother's and father's tense relationship. Mother decided, therefore, to begin taking child to another pediatrician, Dr. Thomas. Mother averred that, as of April 2011, child was caught up with and was following the vaccination schedule established by Thomas.
In July 2011, the court, as noted, awarded mother legal custody of child and granted mother sole medical decision-making authority. However, notwithstanding mother's agreement to continue to follow Thomas's vaccination schedule, and in light of continuing concerns about mother's general resistance to vaccinations, the trial court included a provision in the judgment of dissolution requiring mother to "confer with [child's] pediatrician to ensure that a proper vaccination schedule is in place for [child]."
After the dissolution judgment was entered, father began to notice changes in mother's ability to parent child, which ultimately led him to move for a change in of custody. Those changes related generally to mother's struggles in making medical decisions and to certain harmful repercussions to child of mother's increasing anxieties about child's wellbeing.
For instance, father became increasingly concerned about mother's inability to make medical decisions for child after child developed an eye condition in 2013 that resulted in her eyes crossing, giving her double vision. In February 2014, child's ophthalmologist, Dr. Wheeler, began recommending surgery to address the condition. He explained that vision therapy probably would not solve the underlying problem and that delaying surgery risked child's double vision becoming permanent. Mother resisted scheduling surgery and sought out opinions on online forums suggesting **509 alternatives to surgery. Mother spent dozens of hours discussing *1284 those opinions with child's doctors and their staff. She also started taking child to a different ophthalmologist, Karr, during this time. Karr also recommended surgery. Mother finally agreed to schedule the surgery after father informed her that he would be seeking custody modification.
The surgery, which ultimately took place in December 2014, was successful, and child suffered no long-term consequences to her vision. However, during the prolonged period of delay, child suffered balance and coordination problems-for example, she would fall over while coloring-and she experienced stomach aches. She also struggled at school academically, with writing and fine-motor skills, and she struggled socially. All those problems resolved after the surgery.
During the period after the dissolution, father also became aware that child was again falling behind in her immunizations. Despite the trial court order directing mother to follow the pediatrician's vaccination schedule and notwithstanding mother's assurances that she would continue to do so, mother chose not to vaccinate child for at least two years, between January 2012 and January 2014.
In addition, after the dissolution, father observed that mother frequently changed medical providers for child, often seeing multiple pediatricians and eye-care professionals at once. Father also became aware that mother was not providing appropriate dental care to child. She did not take child for regular dental check-ups, she refused fluoride treatments (falsely telling the dentist that she was providing fluoride at home), and she refused x-rays.
Moreover, after the dissolution, child began having serious emotional problems while in mother's care. Child began to experience emotional dysregulation, exclusively in mother's presence, in which child threw extreme temper tantrums, bit mother, pulled mother's hair, and dug her fingernails into mother's skin. Mother sought treatment for child's behavior from the Morrison Center, which provides, among other things, mental health treatment for children. From March 2012 to August 2014, mother and child participated **510 in three multi-session courses of treatment at the Morrison Center. Morrison Center staff reported that mother often was late for appointments and missed some appointments altogether. All three courses of treatment ended informally by mother instead of formally by Morrison Center staff, and the first course ended when mother simply stopped attending the sessions. Staff concluded that child had an attachment issue with mother and advised mother about how to deal with child's emotions, including giving mother parenting coaching and modeling techniques, but mother was, essentially, unresponsive to those efforts. Mother consistently attributed child's problems to father's parenting and transitions to custody at father's house, and never attained a level of introspection that allowed her to recognize her own role in child's behavior.
Finally, by the time child was in kindergarten, mother had difficulty ensuring that child arrived at school on time, and child was often tardy.
In October 2014, father moved the court to modify the custody determination to give him medical decision-making authority. Specifically, father contended that mother was not meeting child's medical needs in four areas: vision care, dental care, provision of timely vaccinations, and the provision of information to medical providers. Father eventually amended that motion to seek full legal custody of child. As part of the modification proceeding, the court appointed a neutral custody evaluator, Dr. Sabin, to conduct a custody and parenting time evaluation, and it ordered the parties to participate in and make child available for interviews, evaluations, and testing.
Sabin issued a lengthy report in which she concluded that custody of the child should be awarded to father. Her primary findings all related in some way to her foundational conclusion that mother had an "anxious attachment" parenting style. Sabin explained that parents who have an anxious attachment parenting style generally have difficulty promoting their children's development as separate individuals, because they have mixed feelings about their children's independence. And a child who is overly enmeshed or anxiously *1285 attached may, at times, become angry with the **511 anxiously attached parent, when the child is trying to individuate or become more independent.
In mother's case, in Sabin's view, mother's anxious attachment parenting style had a variety of concerning effects. For instance, it manifested in mother's difficulty in helping child with emotional regulation; child's tantrums, which continued until child was five years old, were extreme and prolonged and occurred only in mother's home. Additionally, mother's anxious attachment parenting style caused mother to have trouble setting clear limits with child, including, for example, failing to require child to brush her teeth twice a day, because she did not want to confront child and set limits, even for tooth-brushing.
Sabin also opined that mother's anxious attachment parenting style affected her medical decision-making and was the reason for her difficulty trusting doctors. Sabin stated that, in her experience and in the experience of some of child's medical providers, mother's struggles with decision-making about immunizations and the eye surgery were unique, and her refusal to have child vaccinated notwithstanding the court order to do so demonstrated not only mother's mistrust of medical providers, but also, potentially, trouble accepting authority.
Finally, in Sabin's view, mother's anxious attachment parenting style likely affected other areas of her parenting as well. For example, mother's difficulty separating her own anxiety about being away from child from child's emotional responses to transitions in parenting caused her to consistently contend that child was spending too much time with father. Ultimately, Sabin predicted "with a high degree of medical certainty based on [her] training and experience and based on what [she had] heard from [mother] in the present" that, over time, it will become more and more difficult for mother to promote child's healthy independent identity.
With respect to her recommendation concerning custody, Sabin assumed for purposes of her report that a change in circumstances had been demonstrated; she therefore confined her discussion to the factors set out in **512 ORS 107.137 for determining whether a change in custody was in the best interest of child.[2]
ORS 107.137 requires the court to consider the following factors in determining the best interest of the child in custody matters:
"(a) The emotional ties between the child and other family members;
"(b) The interest of the parties in and attitude toward the child;
"(c) The desirability of continuing an existing relationship;
"(d) The abuse of one parent by the other;
"(e) The preference for the primary caregiver of the child, if the caregiver is deemed fit by the court; and
"(f) The willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child. ***."
ORS 107.137(1).
Sabin found that, of those factors, only three were implicated in this case and that those three factors weighed in favor of transferring custody to father.[3] Specifically, with respect to factor (b), "interest of the parties in and attitude toward the child," Sabin stated that mother's anxious attachment parenting style made it difficult for her to separate her own needs and her own anxiety about being away from child from child's needs and responses to transitions. She further opined that the problem will worsen over time.
Respecting factor (e), the preference for the primary caregiver, Sabin pointed to two *1286 areas of concern. The first, **513 Sabin explained, was mother's difficulty in making medical decisions:
"I don't believe that mother can make competent medical decisions when she is not under the scrutiny of the court. Father cannot continue to appeal to the court when the need for competent medical decisions arise[s]."
The second was mother's mental health. Sabin stated that mother had great difficulty communicating reality in a consistent way; she was vague; she answered questions with non sequiturs; and she provided contradictory information, all of which could be very confusing for a child and others. Sabin further observed that mother often revised the past to make it more acceptable to herself and others, including, for example, telling Sabin and others that father agreed with her medical decision-making and that she and father were actually in agreement about child's medical care, even in the face of contradictory medical and court records. Sabin also noted mother's psychotic "event" in 2011, which, she said, although not necessarily predictive of other psychotic events, was nonetheless an indication that mother was more susceptible than the average person to mental health issues when coping with stress. And, Sabin stated, mother had an unaddressed history of extensive childhood abuse, which likely contributed to her anxious attachment parenting style, her difficulty in decision-making, and her contradictory communications.
Finally, regarding factor (f), the willingness and ability of each parent to facilitate the child's relationship with the other parent, Sabin noted that mother consistently opposed "a significant or developmentally appropriate level of parenting time [for father] at any time since the parental separation."
Sabin concluded that father's parenting was not similarly problematic and that, therefore, the foregoing factors clearly supported making father the custodial parent.
At the modification hearing, the court heard testimony from Sabin, mother, and father. In addition, mother presented the testimony of an expert witness, Dr. Poppleton, **514 a psychologist, who stated that he had reviewed Sabin's notes and report and had talked to many of the witnesses who had contributed to Sabin's report. He concluded that mother was fully capable of meeting child's medical needs, that there was no reason to be concerned that mother's difficulties with medical decision-making would be harmful to child, and that there was no connection between mother's childhood abuse and her parenting. He also believed that Sabin had not performed the level of analysis necessary to support her conclusion that mother had an anxious attachment parenting style and that there was insufficient support for Sabin's conclusion that mother's anxiety stemmed from anything other than her fraught relationship with father. Based on his findings, Poppleton concluded that a change in custody was not warranted.
THE MODIFICATION COURT'S RULING
The modification court ruled that there had been a substantial change in circumstances and that a change in custody was in child's best interest, and it awarded legal custody of child to father. At the conclusion of the hearing, the court stated that it found that child's eye surgery would not have taken place if not for father's pressing the issue and that the delay could have been detrimental to child. Similarly, the modification court expressed its concern that mother had not complied with the trial court's order to adhere to the vaccination schedule. With respect to the Morrison Center sessions, the court found that "there were multiple cancellations and no-show appointments," and "treatment was closed by the Morrison Center without actually an intentional closing by the provider."
The court specifically rejected Poppleton's conclusion that Sabin did not have a basis for opining about mother's anxious attachment parenting style. The court found that Sabin's opinion was well taken, based on her observations of both parents and child and based on her years of experience as a pediatric medical doctor and a psychologist.
*1287 Father's lawyer asked the court to make specific findings of changed circumstances. The court responded as follows:
**515 "[A]t the time that the parties divorced the child was very young. There were some issues regarding medical planning and care, but there were really no educational issues or other kinds of issues that presented themsel[ves]. There was nothing to indicate that mom had any difficulty at that juncture with day-to-day care, scheduling, promptly getting the child to and from or coordinating care and visits. Over the course of the-last four years while mother has been the primary caretaker those have been the issues that have been developing, which is a difficulty in implementing the plan of vaccination that was agreed to and ordered by the Court and also implementing a plan of medical treatment. Fortunately, there's no indication that the child suffered any-any illness as a result of that, but there-it appears to the Court that there was a delay in the surgical decision that may have impacted that first half of kindergarten. And just that the course of difficulty in terms of dealing with the primary treatment providers, the Court's assessment is-and the record supports-that mother was unusually difficult for those primary care providers at the pediatric level and ophthalmological level to assist mother to understand and implement a plan of treatment. Likewise, when mom sought out the treatment at Morrison Center she had difficulty attending the visits, attending them timely and completing the course of treatment. And so those are the things that are really the change of circumstances that support that-and father did not report the same behavioral issues. * * * So it is * ** the deferring, the difficulty in communication and in particular with the Morrison Center multiple, multiple tardies and multiple tardies with the-or no-shows-and multiple tardies with kindergarten. I'm concerned that as the child gets older and her care becomes more complicated that these things will only get worse. Dr. Sabin predicted as much and I think that Dr. Sabin was qualified to make those projections based on what she observed."
The modification court did not explicitly state that custody modification was in the best interest of child, nor did it mention the statutory best-interest factors. After making the statement just quoted, the court turned to mother's lawyer and asked him directly whether he would like "anything additional in terms of clarification." Mother's lawyer asked for a clarification of the court's order respecting the transition of custody to father, but he did not ask for any further **516 findings or clarification of the ruling concerning the standards for modification.
In a written supplemental judgment, the modification court listed the circumstances that it had found to support its custody modification order. Those were similar in all material respects to the court's oral ruling, except that, in the written ruling, the court expressly also found that "[i]t is in the child's best interests that Father be awarded the custody of the parties' minor child at this time subject to Mother's right to parenting time." Mother did not object to that finding or to any other part of the supplemental judgment. The supplemental judgment states, in part:
"3. A significant change of circumstances [has] occurred since the entry of the last judgment, more specifically:
"a. At the time of the parties' divorce the child was young and there were some issues regarding medical care, but there were no educational issues and no indication that mother had problems scheduling or coordinating the child's medical or educational care.
"b. In the four years since the original divorce with Mother as the custodial parent, she had struggled to implement the vaccination schedule as originally agreed to and ordered by the court, [and she] struggled to work with the child's primary care providers at both the pediatric and ophthalmologic levels. Mother has also struggled to maintain a timely relationship with the Morrison Center counselors and completing the course of treatment set forth. Mother has frequently struggled to deliver the child to counseling sessions on time and to school on time.
*1288 "c. Father has not reported the same behavioral issues in the child as Mother has.
"d. The Court concurs with Dr. Sabin's opinion and concern that, as the child grows older, and her care becomes more complex, that the above issues will likely get worse. Dr. Charlene Sabin was qualified to make the projections in this regard based on what she observed during the evaluation.
"4. It is in the child's best interests that Father is awarded the custody of the parties' minor child at this time subject to Mother's right to parenting time."
**517 THE COURT OF APPEALS DECISION
Mother appealed the modification court's ruling to the Court of Appeals, which reversed. The Court of Appeals prefaced its analysis by stating that the parent requesting a change in custody bears the burden of proving a change of circumstances. Botofan-Miller , 288 Or. App. at 678-79, 406 P.3d 175. The court noted that a change in circumstances cannot be based on evidence that was or could have been introduced in an earlier custody proceeding. Id . at 679, 406 P.3d 175. The court stated that "[i]t cannot be a circumstance that the court contemplated at the time of the earlier determination or a circumstance known to the other parent that was not raised during an earlier custody proceeding." Id . (internal quotation marks omitted). Additionally, the court stated, normal developmental changes are not unanticipated changes and, therefore, they cannot, by themselves, provide the basis for a determination of change in circumstance. Botofan-Miller , 288 Or. App. at 679-80, 406 P.3d 175.
Applying those rules, the Court of Appeals determined that the record reflected that most of the circumstances that the modification court had identified as bases for its change-of-circumstances conclusion had been known to father and the trial court at the time of the original custody determination and thus could not be considered as bases for modification. The other circumstances, the court explained, were not detrimental to child and were, therefore, legally insufficient to constitute a change of circumstances substantial enough to justify a change in custody. Id . at 682, 406 P.3d 175. Accordingly, the court held, as a matter of law, that father had not proved that a change of circumstances had occurred, justifying a change of custody. Id . at 687, 406 P.3d 175.
Specifically, the Court of Appeals noted, first, that mother's struggle with implementing the vaccination schedule ordered by the court was already in evidence before the dissolution, and, in any case, did not have a discernible adverse effect on child in light of the fact that child had had all required vaccinations by the time of the modification proceeding. Id . at 680-81, 406 P.3d 175.
**518 Second, the Court of Appeals concluded that, although the child's eye condition arose after the dissolution, mother's struggle in working with child's pediatricians and eye doctors-for instance, spending an extraordinary amount of time discussing child's medical care, seeking opinions from many different doctors, and avoiding making medical decisions altogether, even after being told that those decisions were in child's best interest-also was not a development that began after the initial custody determination, because mother exhibited similar behaviors in connection with her vaccination decisions before the dissolution. Therefore, the court concluded, those behaviors did not constitute a change in circumstances. Id . at 681-82, 406 P.3d 175.
Third, the Court of Appeals decided that mother's failures to attend counseling sessions at the Morrison Center on time were not legally sufficient to justify a change in custody, because, in themselves, the failures to attend counseling sessions did not have an adverse effect on child. Id . at 682-83, 406 P.3d 175.
Fourth, and similarly, the Court of Appeals concluded that mother's struggle to deliver child to school on time also was not legally sufficient to constitute a change in circumstances because, again, the record did not demonstrate that child's tardiness had or threatened to have a discernible adverse effect on her. The Court of Appeals acknowledged that there was evidence in the record (and that the modification court specifically *1289 had found) that child struggled academically and socially for the first half of kindergarten. However, the court stated, the modification court found that those struggles were due to mother's decision to delay the eye surgery (which finding, the Court of Appeals stated, was amply supported in the record) and not to child's tardiness. Id . at 683-84, 406 P.3d 175.
Fifth, the Court of Appeals determined that child's behavioral issues, which the court acknowledged occurred only in mother's care, did not constitute a change in circumstances sufficient to justify a change in custody, because, in the court's view, there was no evidence in the record that child's behavior was caused by a change in mother's parenting abilities or circumstances. The court stated,
**519 "At most, the record indicates that [child's] poor behavior was a result of [child's] normal developmental changes combined with mother's anxious attachment to [child], neither or which *** constituted a new circumstance from the time that the original custody order was entered."
Id . at 685, 406 P.3d 175.
Finally, and relatedly, the Court of Appeals concluded that any harm arising out of mother's anxiously attached parenting style did not, as a matter of law, constitute a change of circumstances, because that characteristic of mother was evident at the time of the original custody determination. Id . at 686, 406 P.3d 175. That is, the court stated, prior to the dissolution, mother already had shown at least two of the signs that Sabin identified as symptomatic of anxious attachment: she had trouble separating from child, as evidenced by her psychotic break, which was brought on by the stress of mother's anticipation of child spending more time with father, and she was overly concerned with medical issues. Additionally, the Court of Appeals noted, Sabin testified that mother's attachment style probably originated from the fact that she had been abused as a child, which happened long before the custody case; it was not the result of some new outside stimulus. Id . at 685-86, 406 P.3d 175.
To summarize, the Court of Appeals concluded that the modification court erred in relying on mother's slow decision making in medical matters, her extensive questioning of doctors, and the ill effects of her anxiously attached parenting style on child, because, in the Court of Appeals' view, those factors existed before the dissolution. Therefore, it considered only mother's struggle to maintain a timely relationship with child's Morrison Center counselors, her struggle to deliver child to school on time, and child's behavioral problems in mother's home in its determination whether a change in circumstances occurred. Considering those three factors together, the Court of Appeals held that, for the same reasons that each of those factors was not legally sufficient on its own to justify a change in custody, those circumstances together also were not legally sufficient. Id . at 686-87, 406 P.3d 175. Based on its conclusion that there had not been a legally sufficient change of circumstances to justify a change of custody, the **520 Court of Appeals did not consider whether a change in custody would be in the best interest of child.[4]
ANALYSIS
A parent seeking to change custody must demonstrate two things:
"(1) [A]fter the original judgment or the last order affecting custody, circumstances relevant to the capacity of either the moving party or the legal custodian to take care of the child properly have changed, and (2) considering the asserted change of circumstances in the context of all relevant evidence, it would be in the child's best interests to change custody from the legal custodian to the moving party."
Boldt and Boldt , 344 Or. 1, 9, 176 P.3d 388 (2008). Because the Court of Appeals found it dispositive, we begin by examining that court's conclusion that the modification court erred in ruling that father met his burden to *1290 prove a change of circumstances legally sufficient to justify a change in custody. We conclude that the Court of Appeals' view of the type of evidence relevant to such a showing was too narrow. As we shall explain, the modification court was not required to ignore evidence of circumstances seriously detrimental to child simply because, in retrospect, it was possible to see that, at the time of the original custody determination, mother already displayed some of the traits that would eventually become seriously problematic in her parenting.
As we stated in State ex rel Johnson v. Bail , 325 Or. 392, 396, 938 P.2d 209 (1997), the child custody statutes do not specify what the concept of a "change of circumstances" means. However, this court has made clear that, to justify a change in custody, a change of circumstances must be "material." Id . at 398, 938 P.2d 209. A material change is one that is adverse to child's welfare. Bogh v. Lumbattis , 203 Or. 298, 300, 280 P.2d 398 (1955). That is, a new development may be considered a legally sufficient change in circumstances only if it is shown that the change has "injuriously affected the **521 child" or affected the custodial parent's "ability or inclination to care for the child in the best possible manner." Boldt , 344 Or. at 9, 176 P.3d 388.
The noncustodial parent cannot obtain a change in custody solely on the basis of facts known at the time of the original proceeding or evidence that could have been introduced at the original proceeding. Greisamer and Greisamer , 276 Or. 397, 401-02, 555 P.2d 28 (1976). In such a situation, the decision in the prior case with respect to those facts is res judicata in a subsequent modification proceeding. Id . at 400, 555 P.2d 28. At the same time, however, when considering new developments, the modification court need not ignore facts in existence at the time of the original custody determination. As the court stated in Bogh , "it is not error for the court to proceed upon new facts occurring since the rendition of the decree, considered in connection with facts formerly established upon hearing in the divorce case[.]" 203 Or. at 304, 280 P.2d 398 (internal quotation marks omitted). Moreover, a change of circumstances can arise from the unanticipated but deleterious effects of the original judgment on the behavior of the custodial parent or the emotional well-being of the child. Gonyea v. Gonyea , 232 Or. 367, 371-72, 375 P.2d 808 (1962).
Thus, our case law recognizes that circumstances existing at the time of dissolution that are not then seen as problematic may later become detrimental to the wellbeing of the child. And, as this court has stated, there is "no constant or standard quantity of change that will qualify" as a sufficient basis for a custody modification; rather, "the amount of change necessary to justify a modification of a decree varies with the facts of the individual case." Gonyea , 232 Or. at 372, 375 P.2d 808.
As we have explained, the standard of review that we employ in this case requires us to consider the evidence in the light most favorable to the modification court's decision to transfer custody to father. That is, we affirm the modification court's factual findings if there is "any evidence" in the record to support them, and we consider that evidence together with reasonable inferences drawn from it. Additionally, we assume that the modification court decided the facts in a manner consistent with its ultimate conclusion **522 that father had established a change in circumstances justifying a change in custody.[5] We have no trouble concluding that, when viewed in that light, evidence in the record supported the modification court's finding that father had proved a change in circumstances.
As the modification court stated, at the time of the dissolution, child was very young, and serious issues related to mother's ability to care for her had not yet arisen. The court specifically found that there had been a material change in mother's medical decision-making in the four years after the initial custody order. That finding *1291 was supported by evidence in the record. First, child was up-to-date with her vaccinations at the time of the dissolution, and mother had agreed to adhere to the pediatrician's vaccination schedule. Second, child's eye condition had not yet manifested itself. Thus, before the dissolution, neither father nor the trial court had reason to know that mother's struggles with medical decision-making would adversely affect child, for example, in delayed vaccinations and in the delay in necessary surgery, which caused child to struggle academically and socially for the first half of kindergarten and placed her at risk of long-term damage to her eyesight.[6] **523 Similarly, although mother displayed some anxiety related to the prospect of father's increased parenting time at the time of the dissolution, the record reflects that mother and child had a healthy relationship and that child was flourishing during that period. Although mother's anxiety was clearly harmful to her-it led to her psychotic episode-nothing in the record suggests that mother's anxiety had any ill effect on child before the dissolution. And, importantly, nothing in the record foretold that mother's anxiety over custody transitions before the initial custody determination indicated an anxious attachment parenting style that ultimately would have serious adverse effects on child.
As the Court of Appeals observed, child's behavior worsened over time after the dissolution, due to child's "normal developmental changes combined with mother's anxious attachment" to her. Botofan-Miller , 288 Or. App. at 685, 406 P.3d 175. The Court of Appeals concluded that that was not a legally sufficient change in circumstances, because child's development, and therefore her reaction to mother's anxious attachment parenting style, was "normal," and, according to the court, normal behavioral changes in children cannot constitute a change in circumstances. However, as Sabin stated in her report and testified at the modification proceeding, mother's anxious attachment parenting style was the source of child's extreme behavior. The modification court was entitled to consider the increasingly detrimental effects of mother's anxious attachment parenting style on child, even though those effects became more detrimental to child's well-being as a result of child's normal developmental changes. And the modification court was entitled to consider child's serious behavioral issues even though they were a natural and normal response to mother's anxious attachment parenting style.
To summarize, before the dissolution, mother displayed a resistance to vaccinations, a tendency to perseverate in decision-making over the vaccinations, and an anxious personality, but evidence in the record supports the modification court's conclusion that those circumstances were not then injurious to child. In the four years between the dissolution and the modification proceeding, however, mother's anxieties evolved into an anxious attachment **524 parenting style, exacerbating both her struggles with medical decision making and her problems separating her own needs from child's, and her capacity to care for child diminished. The modification *1292 court was not required to ignore circumstances detrimental to child's welfare simply because they had antecedents that existed at the time of the dissolution. We therefore conclude that the Court of Appeals erred in holding that mother's refusal to vaccinate in the face of a court order to do so, her protracted medical decision-making and extensive questioning of doctors in connection with child's eye condition, and the increasingly harmful effects of mother's anxiously attached parenting style on child did not, as a matter of law, support the modification court's finding of a change of circumstances.
In addition, when the Court of Appeals considered the factors that it acknowledged to be new developments-the late arrivals at school and the late and missed counseling sessions-it failed to grapple with Sabin's foundational conclusion, which the modification court credited, that those factors also arose out of mother's anxious attachment parenting style and her consequent inability to separate her own feelings and needs from those of child. That is, the overarching context of the modification court's specific findings was Sabin's view that mother had become increasingly unable to parent child and that that inability was-and would continue to be-harmful to child. For that reason, we also hold that the Court of Appeals erred in concluding that evidence of those new developments did not support the trial court's finding of a change in circumstances.
In sum, evidence in the record supports the modification court's conclusion that all the factors that it had identified reflected a material deterioration in mother's overall ability to parent child that occurred after the dissolution. And, as we have stated, when the noncustodial parent establishes that circumstances existing at the time of the initial custody determination that are not then detrimental to the child worsen to the point that the child is or could be seriously harmed, the noncustodial parent has established a change in circumstances justifying a change in custody. Thus, considering the record as a whole, and accepting **525 reasonable inferences and reasonable credibility choices that the modification court could have made, and assuming that the modification court decided the facts in a manner consistent with its ultimate conclusions, we conclude that ample evidence supported the modification court's conclusion that circumstances had changed in mother's "ability or inclination to care for the child in the best possible manner" and that those changes "injuriously affected the child." Boldt , 344 Or. at 9, 176 P.3d 388.
Having reached that conclusion, we turn to mother's argument that the modification court committed a further error in deciding that custody modification was in child's best interest. Mother argues that the modification court failed to analyze the statutory best interest factors listed in ORS 107.137 and that, therefore, its modification of custody cannot stand. According to mother, we cannot assume that the modification court applied the correct legal standard, because the court failed to make a record reflecting its exercise of discretion. See State v. Mayfield , 302 Or. 631, 645, 733 P.2d 438 (1987) (requiring factfinding for OEC 403 determination).
Mother did not preserve that argument in the modification court. State v. Anderson , 363 Or. 392, 410, 423 P.3d 43 (2018) (ordinary preservation rules apply to claims that a trial court failed to make findings necessary for meaningful appellate review). Here, after announcing its ruling transferring custody to father, the modification court expressly asked mother whether she would like the ruling to include "anything additional in terms of clarification." Mother's lawyer asked for a clarification of the court's order respecting the transition of custody, but he did not ask for findings relating to the statutory best interest factors or clarification of the ruling concerning the standards for modification. As this court stated in Anderson , "If defendant believed that further explanation than the trial court provided was necessary for meaningful appellate review, it was incumbent on him to request it."[7] Id .
*1293 **526 One final matter requires our attention. The modification court awarded father attorney fees, over mother's objection. The Court of Appeals reversed the award of attorney fees under ORS 20.220(3)(a), which provides,
"If the appellate court reverses the judgment, the award of attorney fees or costs and disbursements shall be deemed reversed."
In light of our ruling reversing the decision of the Court of Appeals and affirming the modification court's determination to modify custody in favor of father, we also reverse the decision of the Court of Appeals with respect to attorney fees.
The decision of the Court of Appeals is reversed. The judgment of the circuit court is affirmed.

From this point forward, to avoid confusion, we refer to the trial court in the original dissolution proceeding as the "trial court" and to the trial court in the modification proceeding as the "modification court."

Custody modification determinations require a two-step inquiry: (1) asking whether circumstances relevant to the capacity of either parent to take care of the child have changed; and (2) if a change in circumstances has been established, asking whether modification is in the best interest of the child. See Boldt and Boldt , 344 Or. 1, 9, 176 P.3d 388 (2008) (so stating).

Sabin found that factor (a) was not implicated because the child had strong emotional ties with both parents and other family members; factor (c) was not implicated because there was no potential for discontinuing an existing relationship; and factor (d) was not implicated because, as the trial court had ruled in the dissolution proceeding, father had not abused mother.

Because it reversed the trial court's judgment granting custody to father, the Court of Appeals also reversed the trial court's supplemental judgment ordering mother to pay father's attorney fees.

As we have stated, if an appellate court declines to conduct its own de novo review, it reviews a trial court's ruling that a change in custody was in the child's best interest for abuse of discretion.

Our conclusion that evidence of mother's struggles in making medical decisions may be considered as part of the change-in-circumstances determination is not inconsistent with this court's decision in Boldt . In Boldt , the court recognized that medical decisions generally fall within a custodial parent's authority, "unfettered by the noncustodial parent's concerns or beliefs," and it stated,
"Were mother's concerns or beliefs regarding circumcision all that were asserted in the affidavits in this case, we would conclude that mother did not carry her initial statutory burden to demonstrate a sufficient change in circumstances demonstrating father's inability to properly care for M."
344 Or. at 12, 176 P.3d 388. Here, unlike in Boldt , mother did not have full authority to decide whether and when to vaccinate child. The trial court required mother to adhere to a vaccination schedule; father's concern was that she failed to do so. Additionally, evidence in the record showed that mother's struggles with medical decision-making and following the court order were symptomatic of a larger issue created by mother's anxious attachment parenting style, which was becoming increasingly detrimental to child's well-being. Thus, as in Boldt , the change in circumstances that justified the custody modification was not related to father's "concerns or beliefs" about particular medical decisions that mother made, but, rather, was focused on changes in mother's "ability or inclination to care for the child in the best possible manner." Boldt , 344 Or. at 9, 176 P.3d 388.

As we indicated at the outset, we also reject mother's request that we conduct our own de novo review of this or any part of the modification court's ruling. ORS 19.415(3).