Submitted on remand October 19, affirmed December 16, 2020

M. A. B.,
*Petitioner-Respondent,*

*v.*

Anthony Nicholis BUELL,
*Respondent-Appellant.*

Washington County Circuit Court
17PO09823; A166273

479 P3d 1087

This case is on remand from the Supreme Court. *Buell v. Buell*, 366 Or 553, 466 P3d 949 (2020) (*Buell II*). In *Buell v. Buell*, 296 Or App 380, 438 P3d 465 (2019) (*Buell I*), the Court of Appeals reversed the trial court's continuation of a Family Abuse Prevention Act (FAPA) protective order, concluding that petitioner failed to prove that respondent presented an "imminent danger of further abuse" to petitioner. ORS 107.718(1). In *Buell II*, the Supreme Court reversed, concluding that petitioner carried her burden as to that element under ORS 107.718(1). The Supreme Court remanded the case for the Court of Appeals to address, in the first instance, whether the trial court erred by concluding that respondent presented "a credible threat to petitioner's physical safety." *Held*: The trial court did not err. Petitioner presented sufficient evidence about the credibility of respondent's threat to permit the court to continue the FAPA order.

Affirmed.

On remand from the Oregon Supreme Court, *Buell v. Buell*, 366 Or 553, 466 P3d 949 (2020).

Kirsten E. Thompson, Judge.

George W. Kelly filed the brief for appellant.

No appearance for respondent.

Before DeVore, Presiding Judge, and DeHoog, Judge, and Mooney, Judge.

MOONEY, J.

Affirmed.

**MOONEY, J.**

This Family Abuse Prevention Act (FAPA) case comes to us on remand from the Supreme Court. *Buell v. Buell*, 366 Or 553, 466 P3d 949 (2020) (*Buell II*). Petitioner obtained a FAPA protective order against respondent, which respondent contested. The trial court continued the order following a full evidentiary hearing. Respondent appealed, arguing that the trial court erred in continuing the order because: (1) he did not present an "imminent danger of further abuse" to petitioner; and (2) he did not present "a credible threat to petitioner's physical safety." ORS 107.718(1). We agreed with respondent's first argument—that the evidence was insufficient to support the court's conclusion that he presented an imminent danger of further abuse to petitioner. *Buell v. Buell*, 296 Or App 380, 390, 438 P3d 465 (2019) (*Buell I*). Because that argument was dispositive, we did not reach the second argument. Petitioner appealed and the Supreme Court reversed our decision on respondent's first argument, remanding the case for us to address respondent's second argument. *Buell II*, 366 Or at 567. For the reasons set out below, we affirm the trial court's order continuing the FAPA protective order.

The facts of this case have been recited at length in both *Buell I* and *Buell II*. Thus, we provide only a brief factual and procedural summary, borrowing from those two opinions. In *Buell II*, the Supreme Court summarized the key underlying facts:

> "Respondent and petitioner were married in 2014. Together, they have a son, J, who was born in 2015. During the marriage, respondent suffered from depression, for which he took medication. He sometimes also drank to excess. Petitioner testified that respondent raped her twice: once in March 2017 and once in May 2017. The incident in May included respondent dragging petitioner away from J while petitioner was breast feeding. In June 2017, petitioner expressed her unhappiness with the marriage. Respondent replied that, if petitioner left or divorced him, he would kill her and take J."

366 Or at 556.

In *Buell I*, we described the events surrounding the parties' separation:

"In June 2017, petitioner told respondent that she was very unhappy in their marriage. Respondent told petitioner that he would kill her and take J if she ever left or divorced him. Respondent seemed 'very relaxed' and, had petitioner not looked at his face, she 'would have thought maybe he was joking.' However, after looking at respondent, petitioner 'felt like he was completely serious.'

"The following month, petitioner and respondent were showering together with J, and respondent urinated on petitioner and laughed about it. After those events, petitioner and J began spending more nights at the home of petitioner's parents, which was located near her workplace. Petitioner and respondent went to a marriage counseling session, but respondent said that, if petitioner was unhappy, it was her problem and that she needed to work on it.

"* * * * *

"In August, petitioner told J's pediatrician about what had happened between her and respondent. Respondent subsequently went to the pediatrician's office several times without an appointment, seeking to discuss J's well-being. The pediatrician was concerned that respondent had gone to the office 'several times in-person with demands,' and she directed respondent by letter to reach the office by telephone in the future unless he came in with J because of an emergency. The pediatrician found respondent's behavior, which she described as 'repeatedly asking for information from my staff and sitting in the waiting room' very unusual; she had not seen that in her practice. Twice when father visited, it was to obtain medical records to which he was entitled, although the office would have preferred that he request the records in advance, instead of coming in and asking for them to be gathered while he waited. Father also requested that a chart note mentioning allegations of marital rape be amended to say that the allegations 'are no more than allegations,' and the pediatrician informed father that she would append that statement to the chart note that he was concerned about.

"In late August, petitioner and respondent reached a temporary agreement about parenting time. Under that

agreement, respondent saw J twice weekly and there was no requirement that visits be supervised. At meetings when J was transitioned from one parent to the other, respondent 'made it a habit to drive around the block' and find petitioner's car, driving slowly by with an 'angry, rage-filled stare' at petitioner and whoever was with her. Respondent frequently called, emailed, and sent text messages to petitioner, some of which were admitted as exhibits at the FAPA hearing. Petitioner described respondent's messages as sometimes being 'loving and asking [petitioner] to come home'; sometimes, however, 'they were angry, demanding that [she] return home right away with [J].' Respondent also said untrue things about petitioner and her family, claiming that they were crazy. Those communications made petitioner feel 'threatened, upset, scared, [and] frustrated' because she felt that the messages 'exhibited some sort of instability in [respondent's] thought process.'

"Petitioner and respondent participated in a mediation session on October 5, 2017, about custody and parenting-time issues. Toward the beginning of the mediation, respondent glared intensely at petitioner for a long period, which led petitioner to feel that respondent was very angry at her. The mediator, Carr, also felt that respondent's stare was 'meant to communicate extreme anger and rage.' Carr asked respondent to quit staring, and he did, apologizing to Carr. At one point during the mediation, petitioner began to talk about the possibility of respondent's parenting time being supervised, and respondent asked that such a requirement not be imposed. Later, respondent described how 'his parenting time takes place at his parents' anyway.' Petitioner said something like, 'thank you for admitting supervision is necessary' or that she 'thought it was really wonderful that he felt like supervision was necessary as well.' At that point, respondent became 'very upset and angry,' and he said 'Fuck you' three times consecutively while again staring intensely at petitioner. Respondent did not lunge toward petitioner or 'come at' her as he made those statements, but he began to lean forward in his chair."

296 Or App at 382-84 (brackets in original).

Petitioner filed a FAPA petition soon after the mediation session, and the court granted her petition *ex parte* and issued a protective order. Respondent contested the order

and requested a hearing. To continue the protective order, petitioner needed to establish three elements by a preponderance of evidence: (1) that petitioner "has been the victim of abuse committed by the respondent within 180 days preceding the filing of the petition";[1] (2) that "there is an imminent danger of further abuse to petitioner"; and (3) that "respondent represent[ed] a credible threat to the physical safety of" petitioner or her child. ORS 107.718(1).

At the contested hearing, petitioner testified about the events described above and explained that she was afraid for her safety, and for the safety of J. Respondent denied much of the alleged conduct, including petitioner's assertion that he threatened to kill her if they separated. The court continued the protective order, concluding that petitioner had met her burden to establish each of the three elements. The court specifically found that petitioner was credible in her testimony about (1) respondent's threat to kill her and take J and (2) respondent's "subsequent incidents of intimidation by text [message and] at mediation." The court found that respondent was not credible in his denials of that conduct.

Respondent appealed, arguing that the evidence was insufficient to establish that petitioner was in imminent danger of further abuse or that he posed a credible threat to her physical safety. We concluded that the court erred in continuing the FAPA order because respondent's single threat was insufficient to establish that there was "'an imminent danger of further abuse to petitioner.'" *Buell I*, 296 Or App at 385 (quoting ORS 107.718(1)). We did not address whether the evidence supported the court's finding that respondent represented a credible threat to petitioner's physical safety. As noted, upon review, the Supreme Court reversed our decision, holding that the evidence was sufficient to establish that respondent placed petitioner in an "imminent danger of further abuse." *Buell II*, 366 Or at 565. The court remanded the case for us to address in the first instance whether the trial court had correctly determined

---

[1] Respondent concedes that the abuse alleged was sufficient to support the trial court's finding that petitioner was the victim of abuse within 180 days preceding the filing of the petition.

that "respondent represent[ed] a credible threat to the physical safety of the petitioner or of the petitioner's child." ORS 107.718(1). We turn to that question now.

We review the trial court's legal conclusions for legal error. *Kargol v. Kargol*, 295 Or App 529, 530, 435 P3d 814 (2019). We are bound by the court's express factual findings if there is any evidence in the record to support them. *Buell II*, 366 Or at 564. Where the court did not make express factual findings, "'we will presume that the facts were decided in a manner consistent with the [trial court's] ultimate conclusion' as long as there is evidence in the record to support those implicit findings." *Id.* at 565 (quoting *Ball v. Gladden*, 250 Or 485, 487, 443 P2d 621 (1968) (brackets in *Buell II*)). That includes accepting "reasonable inferences and reasonable credibility choices that the trial court could have made." *Botofan-Miller and Miller*, 365 Or 504, 505-06, 446 P3d 1280 (2019).

Respondent argues that the same lack of evidence requiring the court to reject petitioner's "imminent danger" argument should be used to reject her argument that respondent represented a credible threat to her physical safety. Specifically, he focuses on the fact that he and petitioner are now separated, and that any in-person contact that they have is prearranged and always involves J. And, he asserts, despite his preseparation threat to kill petitioner if they separated, he has not followed through on that threat after their separation. Relying on the separation and respondent's lack of follow-through on his threat, respondent argues that there is "no evidence" that he represented a credible threat to petitioner's physical safety.

The same evidence available to show that a petitioner is in imminent danger of further abuse may be used to demonstrate that a respondent represents a credible threat to the petitioner's physical safety. *Hubbell v. Sanders*, 245 Or App 321, 327, 263 P3d 1096 (2011). That is because the two elements are closely related. As a practical matter, it is hard to imagine concluding that petitioner is in imminent danger of further abuse from respondent if respondent does not also present a credible threat to her safety. Our role "is to determine whether, based on the totality of circumstances

[reflected in the record], a reasonable factfinder could draw the factual inferences necessary" to conclude that respondent posed a credible threat to petitioner's safety. *Buell II*, 366 Or at 565-66.

Although the parties' separation is a significant factor to weigh in determining whether respondent represents a credible threat to petitioner's safety, it is not dispositive of that issue. *Walton v. Steagall*, 299 Or App 820, 826, 452 P3d 1059 (2019). Likewise, finding that respondent actually threatened petitioner's physical safety might outweigh any mitigating effects of separation; but it might not. In its analysis of the danger of further abuse, the Supreme Court reasoned that, while "there might be cases where the parties' separation necessarily represents a change in circumstances that mitigates the risk of further abuse, there are also likely to be many cases where a trial court would be entitled to conclude that the parties' separation could be the impetus for further abuse." *Buell II*, 366 Or at 566. That reasoning logically applies to the issue of whether respondent is a credible threat to petitioner's safety as well. Although, here, respondent threatened to kill petitioner, the threat itself need not be "[a]n overt threat of *physical violence*" to prove that a respondent posed a credible threat to the petitioner's physical safety. *Hubbell*, 245 Or App at 327 (emphasis added). And post-separation events can establish a continuing threat to the petitioner's safety. *Walton*, 299 Or App at 826.

Here, the trial court determined that petitioner had made an overt threat of physical violence before the parties separated. It specifically found that petitioner was credible in her assertion that respondent "serious[ly]" threatened to kill her if they separated or divorced. It also found that respondent's denial of that threat was not credible. In addition to the evidence of abuse and respondent's threat to kill petitioner, the record contained evidence that respondent behaved aggressively toward petitioner after their separation, including by: searching for petitioner's car and driving by with an "angry, rage-filled stare"; calling, emailing, and texting her "angry" demands to return home with J; and angrily ending a mediation session by directing expletives at petitioner, while leaning forward in his chair. Even if

there are other explanations for respondent's behavior, the trial court was permitted to choose among competing inferences and, based on its choices, conclude that petitioner represented a credible threat to petitioner's physical safety. *See Buell II*, 366 Or at 565 (appellate court accepts reasonable inferences and credibility choices made by trial court).

To be sure, it is "significant" that the parties separated and have had reduced contact since respondent threatened to kill petitioner. *Kargol*, 295 Or App at 533. However, respondent specifically threatened to kill petitioner *if they separated*. Given that the parties' separation was the circumstance upon which respondent's threat was conditioned and given that they were separated, the trial court was permitted to conclude that respondent's threat and his threatening behavior outweighed any mitigating effects of the parties' separation. *See Buell II*, 366 Or at 565 ("An evidentiary record may support a range of factual inferences about the extent to which a respondent is likely to engage in abusive conduct."); *Walton*, 299 Or App at 826 (explaining that post-separation contacts may provide evidence of a continuing threat to the petitioner's safety). Moreover, notwithstanding their separation, the parties are required to stay in limited contact to facilitate the transfer of J, they had volatile contacts just prior to the issuance of the FAPA order, and respondent continued to send angry messages and to "circle" petitioner in his car. Those facts, combined with respondent's history of abuse and his threat to kill petitioner if they separated, are sufficient to support the trial court's conclusion that respondent posed a credible threat to petitioner's safety. Accordingly, the record supported the court's conclusion that petitioner met her burden to prove each of the elements required by ORS 107.718(1).

Affirmed.